Filed 8/6/26  South Yuba Water District v. Dept. of Fish and Wildlife CA3

<u>NOT TO BE PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

| | |
|---|---|
| SOUTH YUBA WATER DISTRICT et al.,<br>      Plaintiffs and Appellants,<br><br>      v.<br><br>DEPARTMENT OF FISH AND WILDLIFE et al.,<br>      Defendants and Respondents. | C102212<br><br>(Super. Ct. No.<br>34201800235837CUWMGDS) |

South Yuba Water District (District), Michael Rue, Jerry Norene, Victor Graf, Morrison Graf, Gary Miller, and John Belza (together, appellants) appeal from a judgment entered after a bench trial.  This appeal arises out of agreements entered into between the District and the Department of Fish and Wildlife (Department) in 1984 regarding a planned water diversion project.  In 2018, a dispute arose over the continuing applicability of a permit for routine maintenance (also known as a streambed alteration agreement) originally issued as part of these agreements.

On appeal, appellants assert:  (1) numerous challenges to the trial court's conclusion that a new streambed alteration agreement is now required under Fish and Game Code former section 1601[1] (Stats. 1976, ch. 603, § 2; former section 1601); (2) the

---

[1]  Undesignated statutory references are to the Fish and Game Code.

1

trial court erred in concluding the Department did not breach the 1984 agreements; (3) the Department was required to commence a condemnation action; (4) the Department was required to petition the Yuba County Superior Court for relief from the 1984 stipulated judgment (the stipulated judgment); (5) the Department's claims are barred by collateral estoppel and res judicata; (6) the trial court erred in sustaining a demurrer to appellants' cause of action for inverse condemnation; and (7) the trial court erred in awarding costs to the Department.

We will affirm the judgment.

## I. BACKGROUND

A. *Legal Background*

Because this appeal requires us to examine the interplay between the requirements for a streambed alteration agreement under former section 1601 and the 1984 agreements, we will begin by reviewing the relevant provisions of this statute before we summarize the relevant portions of the agreements.[2]

Former section 1601 requires an agency to submit to the Department "general plans" for "any project which will divert, obstruct or change the natural flow or bed, channel or bank of any river, stream or lake designated by the department in which there is at any time an existing fish or wildlife resource or from which these resources derive benefit, or will use material from the streambeds designated by the department." (Stats. 1976, ch. 603, § 2, pp. 1447-1448.) "When an existing fish or wildlife resource may be substantially adversely affected by" the project, the Department "will propose reasonable modifications in the proposed construction as would allow for the protection and

---

[2] Former section 1601 applies to this appeal because it was in effect at the time the streambed alteration agreement at issue in this proceeding was entered into: "Any agreement or any memorandum of understanding executed by the department pursuant to this chapter prior to January 1, 2004, shall be subject to, and shall be governed by, the provisions of this chapter that were in existence prior to that date." (§ 1616.)

continuance of the fish or wildlife resource, including procedures to review the operation of such protective measures." (*Id*., p. 1448.) If the agency and the Department cannot agree on proposals, a panel of arbitrators is established. (*Ibid*.) The agency proposing the project "shall not commence such operations until the department has found that such project will not substantially adversely affect an existing fish or wildlife resource or until the department's proposals, or the decisions of a panel of arbitrators, have been incorporated into such projects." (*Id*., p. 1449.) "The department shall determine and specify types of work, methods of performance or remedial measures which shall be exempt from the operation of this section." (*Ibid*.) Critical to this appeal, former section 1601 provides that "[w]ith regard to any project which involves routine maintenance and operation of water supply … facilities, notice to and agreement with the department shall not be required subsequent to the initial notification and agreement unless the work as described in the agreement is substantially changed, or conditions affecting fish and wildlife resources substantially change, and such resources are adversely affected by the activity conducted under the agreement." (Stats. 1976, ch. 603, § 2, p. 1449.)

B.      *Factual Background*

In the 1980s, the District and non-party Brophy Water District began carrying out a plan to divert water from the Yuba River near Daguerre Point Dam and convey it to a distribution system to irrigate land in southern Yuba County. The water would be supplied under contract by the Yuba Water Agency,[3] which held the rights to divert the river water. To reach the distribution system and users in southern Yuba County, the water would have to cross land south of the Yuba River known as the Goldfields. The planned diversion facility would be off the south bank of the Yuba River near Daguerre Point Dam.

---

[3] The Yuba County Water Agency changed its name in 2018 to the Yuba Water Agency. We refer to the agency by its current name.

3

In 1983, the District entered into an agreement with Yuba Natural Resources, the owner of the Goldfields, to allow and facilitate conveyance of water across its land. Specifically, the District acquired a license and easement for purposes of installation, operation, and maintenance of river diversion facilities.

The Department filed an action challenging the District's compliance with the California Environment Quality Act (CEQA) for the project. The lawsuit was resolved in 1984 by a settlement agreement. The trial court in this proceeding referred to the first of the 1984 agreements as the "Master Agreement" because it attached other agreements. We will do the same.

The Master Agreement provided that the parties would file a motion for a stipulated judgment in the CEQA action and agreed that the materials attached to the Master Agreement provided the Department with the information necessary to evaluate the project's effects on fish and wildlife, and adequately mitigated significant adverse impacts. The parties acknowledged that part of the project could involve construction of a direct diversion channel into the Yuba River. If the diversion channel was constructed, the District agreed to provide for one of the four alternative fish screening devices described in attachments to the Master Agreement and thereafter reasonably operate and maintain the screen.

Each design provided that "[i]t will be necessary to maintain a cross river channel to direct water from the north side of the river to the irrigation diversion and fish screen located along the south bank of the Yuba River." Further, each design anticipated annual maintenance.

In recognition of the "District's need for certainty in the amount of water it is entitled to divert and deliver to its service areas," the Department "agree[d] to take no action, direct or indirect, aside from those necessary to achieve adequate fish screening, which would prevent the South Yuba and Brophy Districts from diverting 600 [cubic feet

4

per second] from the Yuba River into the river diversion facilities contemplated in this [a]greement."

The Master Agreement provided it "shall constitute an irrevocable permit to operate and maintain, repair and reconstruct, the [four] alternative facilities described in Exhibit 'D' including the issuance of a 1601 agreement authorizing District to reasonably relocate materials in the River restricting water flowing to the river diversion works." The agreement explained the Department had concurrently "issued a 1601 Permit, attached as Exhibit 'E', and included herein, for portions of the South Yuba Project which might be subject to that requirement."

The permit mentioned was the agreement for routine maintenance." It recognized the District and Brophy Water District "must perform certain routine maintenance tasks on their canals and fish screen" in order to provide irrigation services for Yuba County. It recited:

"Whereas, pursuant to [former s]ection 1601 …, the Districts must notify the Department of its intention to substantially divert or obstruct the natural flow of; or substantially change the bed, channel, or bank; or use material from streambeds designated by the Department[.]  [¶]  Therefore, this Agreement for routine maintenance project of the Districts' water distribution system and fish screen … will satisfy the requirements of [former s]ection 1601 ….  The Department … and Districts hereby agree to accept and abide by the following terms and conditions necessary to protect fish and wildlife.

"1.  This agreement shall serve as a vehicle to allow Districts to make modifications to the streambed of the Yuba River adjacent to, upstream, immediately below and access from Districts' diversion works necessary to deliver 600 [cubic feet per second] of water to Districts' diversion.

"2.  The Districts shall, prior to commencing work in the river channel, describe to the Department the work proposed."

5

The agreement for routine maintenance set forth only general guidelines for the work. The work had to be "conducted in a reasonable fashion so as to combine the objectives of, a) providing for the functioning of the Project of the Districts and not unnecessarily burdening that operation, and b) providing for the reasonable protection of fish and wildlife habitat." The agreement for routine maintenance also stated broadly that "[m]aintenance work shall not result in conditions which violate current water quality standards as described in the Basin Plan or as may be further established by the Central Valley Regional Water Quality Control Board." The agreement for routine maintenance closed by providing that "[d]isputes regarding Districts' activities pursuant to this Agreement shall be resolved by procedures set forth in [former s]ection 1601."

The District and the Brophy Water District finished the project in 1985. A channel was excavated through a gravel bar in the bed of the Yuba River to bring water flowing in a northern channel of the river to the project on the south bank. The channel allowed water to flow through a dry rock bar, and then along the face of a fish screen that was one of the alternatives approved in 1984. An outlet allowed some of the water to flow back into the river about 200 feet upstream of the dam. Given enough flow, most of the water delivered by the channel would go through the fish screen and be drawn into gated inlets to be conveyed across the Goldfields.

The more extensive operation of the project contemplated by the District and the Brophy Water District in 1984 did not occur. The 600 cubic feet per second diversion rate mentioned in the 1984 agreements was an estimate of the irrigation and other water supply needs of southern Yuba County served by other districts and municipalities. Excavation of deposits ended up being required about every other year.

In 1990, the Yuba Water Agency entered into a facilities agreement (the facilities agreement) with the District regarding the project. It provided for the transfer of ownership of the District's portion of the project, except for the diversion works on the Yuba River and the 1983 conveyance agreement with the owner of the Goldfields. The

6

facilities agreement gave the Yuba Water Agency the exclusive right to use and operate the entire project facilities, including the diversion works and conveyance system. The District assigned to the Yuba Water Agency its benefits and duties under its 1984 agreements with the Department. Thereafter, the Yuba Water Agency operated the project, including performing periodic maintenance excavation work in the riverbed under the District's permit.

The Yuba Water Agency supplied water to the District under a separate contract that expired in 2016. In 2017, the parties signed a new water supply contract with a maximum rate of diversion during irrigation season of 150 cubic feet per second. During this time period, the facilities agreement had also expired and the relationship between the District and the Yuba Water Agency was adversarial.

In 2017, high river flows caused flood damage to the diversion facilities, rendering them inoperable. In April 2017, the Yuba Water Agency submitted a notification of emergency work regarding the diversion project to the Department pursuant to section 1610. In November 2017, the Department notified the Yuba Water Agency it believed the agency had completed the emergency work and the current work being performed was a new, non-emergency project that required the agency to obtain a streambed alteration agreement.

While the Yuba Water Agency worked on obtaining a streambed alteration agreement, the District started corresponding with the Department and arguing it was entitled to conduct the excavation maintenance under the 1984 agreements.

In June 2018, the District conducted two days of excavation in the river. The Department ordered the District to cease work. The work stopped when the Department sent its law enforcement to the site.

A few days later, the Department issued a notice of violation of section 1602 for the District's excavation. In response to the District's further attempts to conduct excavation and requests to arbitrate their disputes under the agreement for routine

7

maintenance, the Department took the position the agreement for routine maintenance was no longer valid due to changed conditions and a new streambed alteration agreement was required. It also noted it had already given the Yuba Water Agency a streambed alteration agreement for similar activities.

The Department first issued a streambed alteration agreement to Yuba Water Agency in August 2018, and the agreement prohibited work prior to July 1. The current five-year streambed alteration agreement permits the Yuba Water Agency to "initiate work beginning April 1 in consultation with" the Department.

C.      *Procedural Background*

Appellants filed the underlying action against the Department and its director (together, respondents) in 2018. Appellant Morrison Graf is a holder of a beneficial interest in land within the District. The other individual plaintiffs are directors of the District and also hold an ownership interest in land within the District. The first amended complaint added the Yuba Water Agency as a defendant. Appellants' second amended complaint alleges causes of action for breach of contract, issuance of a writ of mandate pursuant to Code of Civil Procedure section 1095, inverse condemnation, and declaratory relief. The court sustained respondents' demurrer to appellants' inverse condemnation claim without leave to amend. The Department filed a cross-complaint against the District alleging it violated section 1602 by excavating and removing gravel from the Yuba River in 2018 without a streambed alteration agreement, and seeking a declaration that the agreement for routine maintenance was void due to changed conditions.[4]

In 2024, a trial was held regarding appellants' contract claims and the District's and the Department's declaratory relief claims. The Department dismissed its section 1602 claim after trial. The trial court issued a lengthy final statement of decision.

---

[4]  The Yuba Water Agency also filed a cross-complaint. The District and the Yuba Water Agency settled their claims against each other.

8

The court concluded: "[The District] cannot "read the 'substantially changed' clause and its requirement of a new notification and agreement out of [former] section 1601 just because the parties agreed in advance in 1984 to consult regarding any conditions on periodic maintenance and resolve or arbitrate any differences. If the 1984 agreements are interpreted as contracting away [the Department]'s obligation to require a new notice and agreement if conditions substantially change adversely to fish and wildlife, they would be impermissibly contracting away the state's police power. [Citation.] [¶] However, the court finds that the agreements must be interpreted as incorporating, not negating, this provision."

The trial court's ruling made findings of fact under former section 1601 regarding whether conditions affecting fish and wildlife have substantially changed, and whether these resources are adversely affected by the excavation in the riverbed.

The court explained how in the decades after construction of the cross channel and diversion works, the river channels carrying water during irrigation season fundamentally changed and the flood events of 2017 "drastically changed the geomorphology of the riverbed, requiring reconstruction of the levee, fish screen rock wall, and channel bringing water to them."

After construction of the diversion works, the cross channel that was excavated brought water from the north side of the riverbed to the south side at a 90-degree angle to the river. Over the years, a second south river channel developed. The cross channel still crossed a wide, dry gravel bar, though the gravel bar and the cross channel were eroding. Until 2017, the presence of the cross channel and its angle still rendered the works an off-river diversion.

The trial court found the high river flows in early 2017 rendered the works inoperable and forced the Yuba Water Agency to reconstruct them. The channel morphology had changed dramatically. "The gravel bar between the south river channel and the fish screen was essentially gone and part of the levee had eroded away. The

9

[Yuba Water Agency] had to reconstruct the levee in front of the fish screen, making it wider, and the agency had to excavate the river channel upstream of the previous location of the cross channel." The court found "the facility has become an 'on river' facility, with the south braid of the Yuba River now flowing directly into the opening in the levee and along the fish screen in front of the diversion gates." Based on these changes to the channels, the trial court explained that the periodic excavation of gravel now takes place in the flowing river itself. Further, the new south river channel is wider than the previous cross channel and more prone to accumulate debris due to the difference in angles. "Now, a major channel of the Yuba River flows all year directly into the fish screen, as well as directly past the other side of the levee and the outlet of the bypass channel. As a result, debris deposited by flows now have to be cleared from this river channel as it flows as a wider channel towards and into the fish screen."

The court explained that the south river channel is now the most attractive pathway for migrating salmonids, which increases the chance of salmonid migration through the channel and past the diversion works. The court found there were adverse impacts on sturgeon spawning through turbidity from the excavation flowing down the south channel of the Yuba River and being deposited on eggs below Daguerre Point Dam. Based on these findings and the evidence of potential for harm to juvenile salmonids and redds[5] from excavation, both directly and resulting from turbidity, the court found conditions affecting fish resources had substantially changed by 2017 and that those resources were adversely affected by the change.

The court found that, "as to the periodic maintenance of the channel bringing water to the project, conditions affecting fish and wildlife resources have substantially changed and such resources are adversely affected by those activities. This change

---

[5] A redd is essentially a nest certain fish create when they spawn.

10

occurred, at the latest, in 2017.  As of that date, [the District] was required to provide notice and seek a new agreement with [the Department] to obtain authority to conduct that work."  Further, "[the Department]'s obligations under the 1984 agreement, including to negotiate and arbitrate the conditions on routine maintenance, were no longer in effect in 2018 when [the District] sought to invoke them."

The court found the Department did not breach the 1984 agreements.

The trial court entered judgment in favor of the Department and against appellants. The trial court awarded the Department $71,210.56 in costs.  Appellants filed a timely appeal.

## II.  DISCUSSION

### A.    *Standard of Review*

Appellants assert the issues on appeal are subject to de novo review because they involve questions of statutory interpretation, contract interpretation, and the legal question of whether demurrer was properly sustained.  This is only partially correct.  In particular, appellants' assertion that there is no substantial evidence to support the trial court's finding in favor of the Department under former section 1601 is not subject to de novo review.

"In reviewing a judgment based upon a statement of decision following a bench trial, we review questions of law de novo.  [Citation.]  We apply a substantial evidence standard of review to the trial court's findings of fact.  [Citation.]  Under this deferential standard of review, findings of fact are liberally construed to support the judgment and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings.  [Citation.]

"A single witness's testimony may constitute substantial evidence to support a finding.  [Citation.]  It is not our role as a reviewing court to reweigh the evidence or to assess witness credibility.  [Citation.]  'A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its

11

correctness.' [Citation.] Specifically, '[u]nder the doctrine of implied findings, the reviewing court must infer, following a bench trial, that the trial court impliedly made every factual finding necessary to support its decision.' " (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.)

"In reviewing an order sustaining a demurrer, we examine the operative complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory." (*T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 162.)

" '[E]rror must be affirmatively shown.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) "To demonstrate error, appellant must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error. [Citations.] When a point is asserted without argument and authority for the proposition, 'it is deemed to be without foundation and requires no discussion by the reviewing court.' [Citations.] Hence, conclusory claims of error will fail." (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.)

We note that at times, appellants provide citations to authority that lends no support to their arguments. Other times, appellants cite cases without providing "jump cites to the pages of those cases where pertinent holdings purportedly exist." (*In re S.C., supra*, 138 Cal.App.4th at p. 411.) "[I]t is not the role of an appellate court to carry appellate counsel's burden." (*Id.* at p. 412.)

B. *The 1984 Agreements Do Not Override the Substantially Changed Conditions Provision of Former Section 1601*

1. *The 1984 Agreements*

Appellants argue the District's agreements and rights to conduct excavation and maintenance are irrevocable. Specifically, they disagree with the trial court's holding that the agreement for routine maintenance and "any provision of the Master Agreement (such as ¶¶ 3.0 or 10.0) that also could be interpreted as being a streambed alteration

12

permit" are no longer valid due to substantially changed conditions under former section 1601. The referenced paragraphs of the Master Agreement state in pertinent part:

"This agreement shall constitute an irrevocable permit to operate and maintain, repair and reconstruct, the alternative facilities described in Exhibit 'D' including the issuance of a 1601 agreement authorizing District to reasonably relocate materials in the River restricting water flowing to the river diversion works."

"[The Department] has, concurrent with the execution of this Agreement, issued a 1601 Permit, attached as Exhibit 'E', and included herein, for portions of the South Yuba Project which might be subject to that requirement. This Agreement shall constitute an irrevocable permit to operate, maintain, repair or reconstruct all portions of the South Yuba Project, including any drains, all as described in Exhibit B-1 and C."

Appellants argue the Master Agreement states that it, together with the incorporated agreement for routine maintenance, constitutes an irrevocable permit, and that the District has an irrevocable contractual right to conduct excavation. The trial court found that the parties intended the agreement for routine maintenance to be the permit issued in 1984 that covered maintenance of the project following its construction. It states that it satisfies the requirements of former section 1601 and does not itself use the word "irrevocable." "Only the Master Agreement [citation], which addressed construction of the diversion facilities and attached their proposed plans, uses the term 'irrevocable.' " The trial court found that reference to an irrevocable permit in paragraph 3.0 of the Master Agreement "anticipated that maintenance of the channel would be covered by a distinct 'issuance of a 1601 agreement.' " It explained that paragraph 10.0 also indicates it is the Master Agreement, and not the attached agreement for routine maintenance, that is irrevocable. The court found the 1984 agreements "should not be interpreted as overriding the 'substantially changed conditions' provision of former section 1601 … and that any such interpretation would be void as contracting away [the Department]'s police powers." The court determined the agreements must be interpreted

13

as incorporating, not negating this provision of former section 1601. It noted the parties are presumed to have known and had in mind the applicable laws. (*Miracle Auto Center v. Superior Court* (1998) 68 Cal.App.4th 818, 821.) The court stated that a District official "admitted that the changed circumstances provision of [former] section 1601 was incorporated in the agreement." We agree with the trial court that the 1984 agreements do not override the substantially changed conditions provision of former section 1601. The Master Agreement states that it is "an irrevocable permit to operate and maintain" the project, "including the issuance of a 1601 agreement." It does not suggest the limitations set forth in former section 1601 do not apply.

Appellants argue former section 1601 does not require a new streambed alteration agreement if conditions affecting fish resources substantially change and the resources are adversely affected by activity under the agreement. Rather, appellants assert former section 1601 contemplates what it contends the agreement for routine maintenance and Master Agreement contemplate—subsequent notice and agreement to "account for changed conditions" and, if an agreement cannot be reached, arbitration. We disagree to the extent appellants interpret an agreement as something short of a new streambed alteration agreement. Former section 1601 provides: "With regard to any project which involves routine maintenance and operation of water supply … facilities, notice to and agreement with the department shall not be required subsequent to the initial notification and agreement unless the work as described in the agreement is substantially changed, or conditions affecting fish and wildlife resources substantially change, and such resources are adversely affected by the activity conducted under the agreement." (Stats. 1976, ch. 603, § 2, p. 1449.) The agreement described in former section 1601 is what the Master Agreement referred to as a "1601 agreement" and "1601 Permit," and what is now specifically defined as a "streambed alteration agreement." (§ 1601, subd. (a) [" 'Agreement' means a lake or streambed alteration agreement"]; see *Siskiyou County Farm Bureau v. Department of Fish & Wildlife* (2015) 237 Cal.App.4th 411, 442

14

[explaining term "streambed alteration agreements" was added in 2003 amendments]; see also *Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 518, fn. 22 [explaining entire statutory scheme for streambed alternation agreements was amended in 2003].) Former section 1601 provides that notice and agreement subsequent to the initial notice and agreement as set forth in its provisions are not required unless there was a substantial change in conditions. Thus, when there is a substantial change in conditions, the converse is true: notice and a new streambed alteration agreement is required to cover the new conditions. We disagree with appellants' suggestion to the contrary. As the trial court explained, "[t]he parties' 1984 agreement to resolve or arbitrate disputes about routine maintenance activities must be differentiated from the statutory mandate to renew the application process and obtain a new streambed alteration agreement if conditions substantially change."

Appellants note the agreement for routine maintenance states it "will *satisfy* the requirements of [former s]ection 1601." (Italics added.) This immediately follows the recital, "Whereas, pursuant to [former s]ection 1601 …, the Districts must notify the Department of its intentions to substantially divert or obstruct the natural flow of; or substantially change the bed, channel, or bank; or use material from streambeds designated by the Department." Former section 1601 also provides that "[t]he department shall determine and specify types of work, methods of performance or remedial measures which shall be *exempt* from the operation of this section." (Stats. 1976, ch. 603, § 2, p. 1449, italics added.) Appellants argue "the parties agreed that District's agreements and rights therein would be exempt from any authority that could render them revocable or the diversion of water or functioning of the fish screen interruptible, including any such clause of former [section] 1601." We do not agree that the agreement for routine maintenance's reference to satisfying the requirements of former section 1601 is an exemption thereto. In particular, it is not an exemption to the concept that a new agreement is required when conditions have substantially changed.

15

Rather, it recognizes that the requirements of former section 1601 applied to the agreement. Moreover, we do not read the statements in the Master Agreement regarding irrevocability as creating an exception to former section 1601.

2. *Police Powers*

Appellants contend the agreements comply with the reserved powers doctrine. This is a disagreement with the trial court's statement that "[*i*]*f* the 1984 agreements are interpreted as contracting away [the Department]'s obligation to require a new notice and agreement if conditions substantially change adversely to fish and wildlife, they would be impermissibly contracting away the state's police power." (Italics added.) The trial court cited *County of Ventura v. City of Moorpark* (2018) 24 Cal.App.5th 377, 390, which explained that "[a] government entity may not surrender, for a potentially indefinite period of time, its authority to exercise discretion on matters within its police power." There, the appellate court found sections of a settlement agreement void because they surrendered the Broad Beach Geologic Hazard Abatement District's discretion to alter haul routes in the future. (*Ibid*.) "[I]t is settled that the government may not contract away its right to exercise the police power in the future." (*Avco Community Developers, Inc. v. South Coast Regional Com*. (1976) 17 Cal.3d 785, 800, superseded by statute on other grounds as stated in *Davidson v. County of San Diego* (1996) 49 Cal.App.4th 639, 646-647.) Therefore, even assuming the Master Agreement included a promise by the Department not to require a new streambed alteration agreement due to substantially changed conditions in the future, "the agreement would be invalid and unenforceable as contrary to public policy."**6** (*Ibid*.)

---

**6** Appellants incorrectly rely on arguments pertaining to voidable contracts. "Black's Law Dictionary (12th ed. 2024) defines 'void ab initio' as '[n]ull from the beginning, as from the first moment of a contract is entered into. A contract is void ab initio if it seriously offends law or public policy, in contrast to a contract that is merely voidable at

16

Appellants contend the agreements do not impermissibly contract away the state's police power because police power is the broad authority to enact legislation for good, and the Department "does not have power to legislate," and the agreements do not expressly bargain away the power to legislate. We are unpersuaded. "The police power is 'the power of sovereignty or power to govern—the inherent reserved power of the state to subject individual rights to reasonable regulation for the general welfare.' [Citation.] The police power extends to legislative objectives in furtherance of public peace, safety, morals, health and welfare." (*Massingill v. Department of Food & Agriculture* (2002) 102 Cal.App.4th 498, 504.) With respect to the statutory scheme surrounding streambed alteration agreements, our Legislature has explained "the protection and conservation of the fish and wildlife resources of this state are of utmost public interest. Fish and wildlife are the property of the people and provide a major contribution to the economy of the state, as well as providing a significant part of the people's food supply; therefore their conservation is a proper responsibility of the state. This chapter is enacted to provide conservation for these resources." (§ 1600; accord Stats. 1976, ch. 603, § 2, p. 1447.) The Department is part of the Natural Resources Agency (§ 700) and is tasked with administering the Fish and Game Code (§ 702). It "is the agency of the state charged with conservation and maintenance of the wildlife resources of the state." (*Sierra Club v. State Bd. Of Forestry* (1994) 7 Cal.4th 1215, 1234; see also § 712.1, subd. (a)(1) ["The department's mission is to manage California's diverse fish, wildlife, and plant resources, and the habitats upon which they depend, for their ecological values and for their use and enjoyment of the public"].) Requiring a new streambed alteration agreement under former section 1601 by the Department is an exercise of its regulatory police powers. (See *Siskiyou County Farm Bureau v. Department of Fish & Wildlife, supra*, 237

---

the election of one party to the contract.' " (*Picayune Rancheria of Chukchansi Indians v. North Fork Rancheria of Mono Indians* (2025) 117 Cal.App.5th 91, 108, fn. 5.)

17

Cal.App.4th at p. 446 [interpreting section 1602 and explaining that "[*i*]*f* a given diverter's usage is found to be substantial, requiring compliance with mitigation measures or halting such usage would not be a taking, but a proper exercise of regulatory police powers"].)

Appellants also argue the agreements do not impermissibly contract away the state's police power because the Department can engage in arbitration and it is the arbitration panel that "makes the final determination." Appellants contend the arbitration provision in the agreement for routine maintenance renders *County of Ventura v. City of Moorpark, supra*, 24 Cal.App.5th 377 distinguishable. Appellants assume arbitration can compel modifications to the agreement. As previously set forth, the agreement for routine maintenance provides that disputes regarding the District's "activities pursuant to" the agreement for Routine Maintenance are to be "resolved by procedures set forth in" former section 1601. This language does not expressly provide that the agreement itself can be modified through arbitration. Moreover, to the extent appellants argue that portions of the Master Agreement render the Department unable to ever require a new streambed alteration agreement based on substantially changed conditions despite statutory authority to the contrary, we agree that would be an impermissible contracting away of the state's police power. Further, we should "not read into the contracts an abrogation of the potential future exercise of the sovereign police power." (*Professional Engineers v. Department of Transportation* (1993) 13 Cal.App.4th 585, 591.) "[T]he reservation of this power is implicit in all government contracts and private parties take their rights subject to it." (*Ibid*.) Thus, we find no error in the trial court's conclusion that in the event of substantially changed circumstances under former section 1601, a new streambed alteration agreement was required.

C.      *The Department Is Not Obligated to Arbitrate Under the Old Agreement*

Appellants argue the Department is obligated to engage in arbitration. As previously set forth, the agreement for routine maintenance provides that "[d]isputes

18

regarding Districts' activities pursuant to this Agreement shall be resolved by procedures set forth in" former section 1601. The District requested arbitration under this provision and the Department took the position the agreement for routine maintenance was invalid due to substantially changed conditions. We agree with the trial court that "[t]he parties' 1984 agreement to resolve or arbitrate disputes about routine maintenance activities must be differentiated from the statutory mandate to renew the application process and obtain a new streambed alteration agreement if conditions substantially change." The trial court explained that "the parties' agreement in 1984 to agree upon (or arbitrate) annual conditions on the inherently variable channel maintenance was subject to the caveat that new notice and agreement for a permit was required if conditions substantially changed." The trial court found the Department's obligations under the 1984 agreement, including to negotiate and arbitrate the conditions on routine maintenance, were no longer in effect in 2018 when the District sought to invoke them. Appellants essentially argue the parties agreed on arbitration rather than a new agreement as the mechanism to deal with substantially changed conditions. Similarly, they argue the prior agreement cannot be invalidated until the District presents a list of the protective measures it seeks and engages in arbitration of any disputes. These arguments are unpersuasive. Whether or not the original agreement contained vague terms because of the inherent variability of the contemplated maintenance work, here the trial court found, "as to the periodic maintenance of the channel bringing water to the project, conditions affecting fish and wildlife resources have substantially changed and such resources are adversely affected by those activities." Under former section 1601, the old streambed alteration agreement no longer applies, and a new agreement is required. This is not, as appellants suggest, inconsistent with any legislative directive that arbitration be used to resolve disputes because former section 1601 directs that a new streambed alteration agreement process be commenced—not merely arbitration. The trial court did not err in concluding the

19

Department was not obligated to arbitrate outside of a new streambed alteration agreement process.

*D.      The Department Did Not Breach the 1984 Agreements*

Appellants argue the court erred in concluding the Department did not breach the 1984 agreements.[7] As previously set forth, the Department was under no obligation to arbitrate without a new streambed alteration agreement process. As such, the trial court did not err in concluding the Department did not breach an obligation to arbitrate conditions on routine maintenance.

Appellants assert the Department did not adhere to section 1612 before suspending an agreement, but even assuming this statute applies to streambed alteration agreements entered into in 1984, it would only apply if the agreement was suspended because it was not complied with: "The department may suspend or revoke an agreement at any time if it determines that an entity is not in compliance with the terms of the agreement or fails to provide timely status reports as required by subdivision (g) of Section 1605. The department shall adopt regulations establishing the procedure for suspension or revocation of an agreement. The procedure shall require the department to provide to the entity a written notice that explains the basis for a suspension or revocation, and to provide the entity with an opportunity to correct any deficiency before the department suspends or revokes the agreement." (§ 1612.) These provisions are inapplicable to the situation where a new agreement is required due to changed conditions.

---

[7] Lurking under this heading is an undeveloped argument that the trial court's decision is incompatible with due process. "Failure to provide proper headings forfeits issues that may be discussed in the brief but are not clearly identified by a heading." (*Pizarro v. Reynoso* (2017) 10 Cal.App.5th 172, 179.) Additionally, the authorities cited by appellants do not demonstrate any basis for concluding the fact a new streambed alteration agreement is required by former section 1601 violates due process.

As the trial court explained, appellants' other claims for breach of contract are based on paragraph 4.0 of the Master Agreement, in which the Department recognized the "District's need for certainty in the amounts of water it is entitled to divert and deliver to its service areas, and the Department … agrees to take no action, direct or indirect, aside from those necessary to achieve adequate fish screening, which would prevent the South Yuba and Brophy Districts from diverting 600 [cubic feet per second] from the Yuba River into the river diversion facilities contemplated in this [a]greement." The trial court found the Department had not breached this provision, either in the past or by repudiating future performance. The trial court found the District has a contract with the Yuba Water Agency to divert 150 cubic feet per second for its use "and [the Yuba Water Agency] has never been unable to do so because of the actions of" the Department.

Appellants argue the Department has established it is prohibiting future excavation before July 1, and this is an anticipatory breach of the Master Agreement and stipulated judgment regardless of the validity of the agreement for routine maintenance. "Repudiation of a contract, also known as 'anticipatory breach,' occurs when a party announces an intention not to perform prior to the time due for performance." (*Stephens & Stephens XII, LLC v. Fireman's Fund Ins. Co*. (2014) 231 Cal.App.4th 1131, 1150.) Appellants argue no temporal limitation is found in the Master Agreement or stipulated judgment, and maintenance before July 1 is required for certainty in the amount of water that can be diverted. As appellants acknowledge, the trial court found that, since 2018, the Department "has allowed routine maintenance prior to July 1 when needed. While the conditions in the [Yuba Water Agency] permits speak for themselves and require that concurrence from [the Department], there was no evidence that [the Department] will discontinue that practice." Appellants have failed to establish that any of the trial court's findings were not supported by substantial evidence or any error in the trial court's rejection of its breach of contract claim.

21

*E.     The Department Was Not Required to Commence a Condemnation Proceeding*

Appellants make an underdeveloped argument that the Department was required to commence a condemnation proceeding to escape its contractual obligations. They cite no authority that actually supports this assertion. As such, appellants have failed to establish any error on this point.

*F.     The Trial Court's Findings Under Former Section 1601*

*1.     The Trial Court Did Not Misapply the Law*

As previously set forth, former section 1601 provides that "[w]ith regard to any project which involves routine maintenance and operation of water supply … facilities, notice to and agreement with the department shall not be required subsequent to the initial notification and agreement unless the work as described in the agreement is substantially changed, or conditions affecting fish and wildlife resources substantially change, and such resources are adversely affected by the activity conducted under the agreement." (Stats. 1976, ch. 603, § 2, p. 1449.) The court quoted this statutory requirement and explained that its "findings of fact [] focus on whether 'conditions affecting fish and wildlife [have] substantially change[d], and such resources are adversely affected by the activity conducted,' namely the excavation in the river bed." Nonetheless, appellants proffer various arguments that the trial court misapplied the law in conducting this analysis. As we will explain, we find each of these arguments unpersuasive.

Appellants contend the trial court misinterpreted and misapplied former section 1601 because, even where conditions have substantially changed, the resources must be adversely affected by the *activity* conducted under the agreement. This argument is unavailing because the court understood the law and made the necessary finding. The court found that, "as to the periodic maintenance of the channel bringing water to the project, conditions affecting fish and wildlife resources have substantially changed and such resources are adversely affected by those activities." Appellants' arguments are

22

based on instances in which the court phrased the requirement differently: "The court therefore finds that conditions affecting fish resources have substantially changed (at the latest by 2017) and those resources are adversely affected *by the change*." (Italics added.) In context, it is clear the court applied the proper analysis. This statement followed the trial court's discussion of the resulting impacts on fish due to the activity conducted under the agreement and not merely the substantial changes to the geomorphological conditions above the dam. Indeed, appellants' next argument contradicts the assertion that the trial court omitted a finding of adverse effect from the activity conducted under the agreement by challenging this finding as being based on potential rather than actual adverse effects. We turn now to this assertion.

Appellants contend the trial court misinterpreted former section 1601 because there must be actual as opposed to potential adverse effects and harm to fish from the activities conducted under the agreement. The court discussed the evidence of potential adverse effects before making the finding required by statute. Ultimately, the court found "there were adverse impacts on sturgeon spawning, through turbidity from the excavation flowing down the south channel of the Yuba River and being deposited on eggs below Daguerre Point [D]am. The evidence showed current potential for harm generally to juvenile salmonids and redds from excavation, both directly and from resulting turbidity. Though [the District]'s fish biologist found none in the areas surveyed on two dates in June, 2018, the court finds that they are now more likely to be present in the south channel in the area of the excavation as it is flowing water into the diversion facilities and downstream of that area, including as to the channel flows to and over Daguerre Point Dam. [¶] The court therefore f[ound] that conditions affecting fish resources have substantially changed (at the latest by 2017) and those resources are adversely affected by the change." We are unpersuaded the trial court misinterpreted the statute by considering evidence of the probability of adverse impacts alongside evidence of actual impacts in

23

making its factual findings that there were adverse effects. And once again, we now turn to an argument that essentially disproves the one we just rejected.

Apparently recognizing the trial court found actual adverse impacts on sturgeon, appellants contend that because the court did not make findings that conditions affecting sturgeon (including spawning sturgeon eggs) have substantially changed, any alleged impacts to sturgeon and the court's statements regarding sturgeon are not sufficient as a matter of law to meet the requirements of former section 1601. This argument relies in part on a misunderstanding of the trial court's ruling. The court found that the *listing* of a certain type of sturgeon was not a changed condition; it did not find that there were no changed conditions as to sturgeon. Appellants argue the changed conditions found by the trial court—geomorphological changes above Daguerre Point Dam—do not substantially affect sturgeon and spawning sturgeon eggs, because they cannot swim past the dam to the area where excavation work is conducted under the agreements. This is irrelevant because the court found there were adverse impacts on sturgeon through turbidity from the excavation flowing down the south channel and being deposited on eggs below the dam.

Appellants contend the trial court improperly relied on hypothetical excavation activities in the flowing river without protective measures and when species are present rather than the actual activity conducted under the agreement at issue. The trial court did consider the effects of the activity conducted under the agreement at issue. Moreover, appellants' argument essentially asks us to reweigh the evidence, which we cannot do. (*Thompson v. Asimos, supra*, 6 Cal.App.5th at p. 981.) Further, appellants' suggestion that because the Yuba Water Agency has a streambed alteration agreement, the Department could have engaged in arbitration to obtain the same protective measures and therefore there can be no harm as a matter of law under the old streambed alteration agreement is unavailing.

Appellants assert the court erred as a matter of law in its analysis because the trial court failed to account for "baseline conditions" in making its determination. We again conclude appellants essentially ask us to reweigh the evidence under the guise of asserting legal error. The trial court detailed both the project plans and the cross channel that was originally constructed before explaining the substantial changes that occurred. Appellants suggest the agreement for routine maintenance anticipated the river's geomorphology would change through its sparse terms, and thus geomorphological changes in the river cannot be used to invalidate the agreement for routine maintenance. We disagree with the suggestion that the language of the agreement for routine maintenance anticipated the changes at issue here such that the court's analysis of substantial change amounted to legal error.

We reject each of appellants' assertions that the trial court's findings under former section 1601 were based on any legal error.

2. *The Trial Court's Findings Were Supported By Substantial Evidence*

Alternatively, appellants argue there is no substantial evidence to support a finding in favor of the Department under former section 1601. This argument is equally unpersuasive. Again, we do not reweigh the evidence in conducting a substantial evidence review. Appellants cite testimony that the original design of the cross-river channel was not at a 90-degree angle with the river and was in that way similar to the current south channel. Nonetheless, the same witness testified the cross-river channel, as designed, differed from the current south channel because it was not a branch of the river and would not continue down to the dam as the south channel does. Moreover, there was substantial evidence that the new channel carries more sediment to the fish screen and is a migratory pathway for fish. Further, the operation of heavy equipment in the channel would disturb fish and suspend fine sediment. There was evidence to support the trial court's conclusion the excavation work harmed fish. Substantial evidence supported the

trial court's finding of a factual basis for requiring a new streambed alteration agreement under former section 1601.

G.    *The Stipulated Judgment Did Not Preclude the Trial Court's Findings*

Appellants argue the Department must petition the Yuba County Superior Court to be relieved of its obligations.  The stipulated judgment entered by the Yuba County Superior Court in 1984 states that the water diversion project "when constructed substantially in accordance with the project descriptions above set forth or referred to, including the standards and the mitigation measures therein described, will adequately mitigate … any adverse fishlife impacts on downstream migrant salmon and steelhead in the Yuba River that might result from such river diversion facilities."  Appellants argue invalidating the agreement for routine maintenance "effectively extinguishes the Stipulated Judgment" and also "violates the CEQA findings in the Stipulated Judgment."  The trial court found the stipulated judgment did not preclude the Department from now contending the conditions, as they affect fish and wildlife resources, have changed.  Appellants have failed to demonstrate any error in this conclusion.  Moreover, appellants have failed to demonstrate the Department was required to petition the Yuba County Superior Court for relief from the stipulated judgment.

H.    *Res Judicata and Collateral Estoppel Do Not Apply*

Appellants argue the Department's claims are barred by res judicata and collateral estoppel because the validity of the District's agreements and alleged changed circumstances were litigated in a 2012 proceeding.  Our Supreme Court has "frequently used 'res judicata' as an umbrella term encompassing both claim preclusion and issue preclusion, which [it] described as two separate 'aspects' of an overarching doctrine." (*DKN Holdings LLC v. Faerber* (2015) 61 Cal.4th 813, 823.)  The primary aspect is now referred to as "claim preclusion" rather than "res judicata."  (*Id*. at p. 824; *Samara v. Matar* (2018) 5 Cal.5th 322, 326.)  The secondary aspect is now referred to as "issue preclusion" rather than "collateral estoppel."  (*DKN Holdings, supra*, at p. 824; *Samara,*

26

*supra*, at p. 326.) Appellants' briefing fails to acknowledge or discuss the requirements for applying either issue or claim preclusion. (See *DKN Holdings, supra*, at pp. 824-825 [outlining requirements for issue and claim preclusion].) Regardless, neither type of preclusion applies because the changes the trial court in this proceeding found substantial had not yet occurred at the time of the prior proceeding. (See *Planning & Conservation League v. Castaic Lake Water Agency* (2009) 180 Cal.App.4th 210, 227 [res judicata "may not apply when 'there are changed conditions and new facts which were not in existence at the time the action was filed upon which the prior judgment is based' "].)

I.     *Appellants' Inverse Condemnation Claim Is Moot*

As previously set forth, the court sustained respondents' demurrer to appellants' cause of action for inverse condemnation without leave to amend. This cause of action alleged the District has "contractual rights to utilize and enjoy property and to continue to operate, maintain and utilize that property as set forth in" the 1983 agreement with Yuba Natural Resources, the Master Agreement, and the agreement for routine maintenance. The trial court sustained the demurrer to this cause of action on the basis that a political subdivision of the state such as the District does not possess the legal standing necessary to prosecute on behalf of its constituent landowners and water users a claim for inverse condemnation against the state. Additionally, the trial court explained that "the right to operate the subject water diversion facility and to excavate the river to ensure water flow (which right was allegedly taken by the Department) arose from contract," and a constitutionally-protected property interest must support a cause of action for inverse condemnation. Appellants contend the trial court erred in sustaining respondents' demurrer to their cause of action for inverse condemnation. Relatedly, they argue they alleged sufficient facts to establish they have standing to maintain a claim for inverse condemnation.

Respondents argue the inverse condemnation claim is moot because it was premised on the agreement for routine maintenance and the provisions of the Master

27

Agreement that the trial court determined to be invalid. (*Behr v. County of Santa Cruz* (1959) 172 Cal.App.2d 697, 713-714.) On reply, appellants argue they also had rights under other parts of the 1984 agreements as well as the 1983 agreement with Yuba Natural Resources, including the right to operate and maintain the diversion and to divert water, and an exclusive license and easement. The parties disagree whether the 1983 agreement between the District and Yuba Natural Resources that granted the District the exclusive right to use the land for water diversion facilities could support the inverse condemnation claim. We agree with respondents that because this agreement does not authorize unrestricted excavation of the Yuba River, it cannot form the basis for a cause of action for inverse condemnation. Furthermore, to the extent appellants' claims are not already mooted by the trial court's determination of their obligations under the referenced agreements, their arguments conflict with the factual findings the trial court made in the context of denying their breach of contract claims. As such, we agree with respondents that the issue is moot.

*J.     The Trial Court Did Not Err by Awarding Costs to the Department*

Appellants argue the trial court erred by awarding costs to the Department because it unsuccessfully prosecuted a claim for a violation of section 1602. They also assert the cost award under Code of Civil Procedure section 998 is improper because it was unreasonable and had no realistic prospect of acceptance.

"The general cost recovery rule in California entitles the prevailing party in a civil action or proceeding to recover its litigation costs as a matter of right. Code of Civil Procedure section 1032 sets out the rule and defines who qualifies as a 'prevailing party.' … [¶] [Code of Civil Procedure s]ection 998 modifies [Code of Civil Procedure] section 1032's general rule. To encourage the settlement of cases before trial, [Code of Civil Procedure] section 998 shifts the liability for costs under some circumstances. As relevant here, when a plaintiff rejects or fails to timely accept a qualifying defense offer (section 998 offer), and then 'fails to obtain a more favorable judgment or award,' the

28

plaintiff is not entitled to its postoffer litigation costs and must pay some or all of the defendant's postoffer costs."  (*Madrigal v. Hyundai Motor America* (2025) 17 Cal.5th 592, 599, fn. omitted.)

The authorities relied upon by appellants do not establish any error.  (See *Carver v. Chevron U.S.A., Inc*. (2002) 97 Cal.App.4th 132, 151 ["it was not an entire action that was voluntarily dismissed, but only one cause of action among many"].)

### III.  DISPOSITION

The judgment is affirmed.  Respondents Department of Fish and Wildlife and its director shall recover their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


/S/
RENNER, J.

We concur:



/S/
MAURO, Acting P. J.



/S/
FEINBERG, J.

29